IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

MARVIN ARMSTRONG, et al.,            )
                                      )
                  Plaintiffs,         )
                                      )
         vs.                          )          No. CIV-03-255-C
                                      )
DONALD E. POWELL, Chairman of the     )
FEDERAL DEPOSIT INSURANCE CORP.)
                                      )
                  Defendant.          )

## MEMORANDUM OPINION AND ORDER

Plaintiffs, seven current or former employees of the Federal Deposit Insurance

Company (FDIC) and one spouse of a deceased former FDIC employee, brought this action

alleging that the FDIC adopted an express policy to "thin its ranks" of management-level

employees over the age of 40 in violation of the Age Discrimination in Employment Act

(ADEA).  Plaintiffs have moved to certify a class consisting of

> current and former FDIC employees in all divisions who [from 1995 to
> present] applied for positions . . . in Grade Levels 11-15, E-1 and E-2 and who,
> at the age of 40 or older, (i) were referred for final selection . . . [but] not
> selected for such jobs that were awarded to persons 5 or more years younger,
> (ii) declined to apply for jobs because of the FDIC's pattern and practice of
> awarding them to persons significantly younger, [or][1] (iii) were constructively
> discharged from the FDIC because of the FDIC's pattern and practice of
> ageism..[2]

---

[1] Plaintiffs use the conjunctive "and" instead of "or", but argue that these are three different
classes of employees and that putative plaintiffs need only meet one of these criteria.  Thus, the
Court has substituted the word "or" to conform to Plaintiffs' argument.

[2] This description of the putative class was narrowed in Plaintiffs' reply brief.  (See Pls.'
Reply, Dkt. No. 117, at 3.)  The Court analyzes the putative class as so narrowed.

Should the Court determine that certification of the entire class is improper, Plaintiffs propose the Court certify one or more of the identified subclasses. Defendant objects to certification, arguing that Plaintiffs have not met the standard of Fed. R. Civ. P. 23. The Court agrees and finds that certification is not warranted for either the entire class or the subclasses identified by Plaintiffs.

## STANDARD

As the parties seeking certification, Plaintiffs bear the burden of proving that all the requirements of Fed. R. Civ. P. 23(a) and the requirements of one subsection of Fed. R. Civ. P. 23(b) are met. <u>Rex v. Owens</u>, 585 F.2d 432, 435 (10th Cir. 1978). Fed. R. Civ. P. 23(a) lists the following prerequisites to any class action: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Plaintiffs assert that they can meet the requirements of either Fed. R. Civ. P. 23(b)(2) or (3). Rule 23(b)(2) permits certification when the parties are seeking primarily injunctive or declaratory relief. Where the predominate relief sought is money damages, section (b)(3) provides the applicable standard. This section requires that:

> the court find[] that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of the members of the class in individually controlling

2

the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Plaintiffs could receive injunctive or declaratory relief were the class certified under Rule 23(b)(3).  See Boughton v. Cotter Corp., 65 F.3d 823, 827 (10th Cir. 1995).

In keeping with these factors, the decision whether to certify "involves intensely practical considerations, most of which are purely factual or fact-intensive." Reed v. Bowen, 849 F.2d 1307, 1309 (10th Cir. 1988).  "Each case must be decided on its own facts, on the basis of 'practicalities and prudential considerations.'" Id. (quoting U.S. Parole Comm'n v. Geraghty, 445 U.S. 388 at 406 n.11 (1980)).  Therefore, the Court focuses on whether the requirements of Rule 23 are satisfied and makes no decision as to whether Plaintiffs' claims have merit.  Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177-78 (1974).  And, although courts are inclined to err in favor of certification, Plaintiffs are in no way excused from their strict burden of proof.  Meyers v. Sw. Bell Tel. Co., 181 F.R.D. 499, 501 (W.D. Okla. 1997); see also Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 161 (1982) (requiring courts to perform a "rigorous analysis" to ensure that procedural requirements are met).

# BACKGROUND

## A. FDIC Downsizing[3]

Following the wane of the banking crisis that plagued the late 1980s and early 1990s, the FDIC found itself with an excess of nearly 1,500 employees. Most of the excess personnel were at the management level, or Grades 12 and above,[4] and were located primarily in three divisions, Legal, Asset Servicing, and Resolutions.[5] To complicate matters, the FDIC had to absorb nearly 3,000 employees from the Resolution Trust Corporation (RTC) in December 1995, and was prohibited via statute from conducting a Reduction-in-Force until 1997.[6] Although the agency had been under a hiring freeze for approximately two years, the imbalance in the staffing could not be cured through a natural attrition rate.

In various meetings in the fall of 1995, the FDIC candidly discussed how to downsize the agency. On September 26, 1995, the Board voted to offer a buyout program to certain

---

[3] In their Reply, Plaintiffs clarify that they are not complaining that the downsizing or associated RIFs were conducted in a manner that discriminated against workers age 40 or older. Therefore, much of this section is relevant merely to "set the stage."

[4] Employees' positions are classified by "grade" levels that range from 1 to 15 and correspond to the level of skill and responsibility involved. Further, executive-level personnel, typically regional managers or director-level positions, were classified as E1 to E5. Beginning in April 2003, all executive-level personnel are classified as EMs.

[5] The FDIC is a federal agency with its headquarters in Washington, D.C. The organization has fourteen divisions and offices, eight regional and area offices, and field offices in nearly every state.

[6] The statutory prohibition actually only protected those employees who were RTC employees. However, the protection was extended by then-acting chair Hove to all FDIC employees.

4

employees.  The buyout was available only to those employees in job categories, grade
levels, and duty locations identified as excess according to the Core Staffing Analysis.[7]
According to Plaintiffs, this was the first step in "downsizing the FDIC and reshaping it for
the future by targeting older, 'retirement eligible' employees for separation." (Pls.' Br., Dkt.
No. 77, at 4.)

The buyout option was earmarked for persons close to retirement.  Following is an
excerpt from one of the Board discussions of the various buyout options:

| | |
|---|---|
| Director Fiechter: | How much more generous is the 3B than option 2?  I'm not certain I fully understand the difference. |
| Mr. Squerrini: | Well, with – under 3B, by allowing people to get the greater of either 50 percent of salary or severance pay, severance pay can go up to as much as, using the general government format, can go up to as much as a year's pay. |
| . . . . | |
| Chairman Helfer: | For the senior people, who are the ones we're – |
| Mr. Squerrini: | For the more senior people. |
| Chairman Helfer: | – trying – who need to leave. |
| Director Fiechter: | Senior?  But it's – it's more seniority I take it? |
| Mr. Longbrake: | Well, it'll – it'll be most – it'll be mostly those who otherwise would be eligible for retirement, who would only get 50 percent under normal circumstances.  Almost all those would get 100 under the severance arrangement. |
| Director Fiechter: | Okay.  But it – but it isn't – it isn't the senior staff then.  It would be even a secretary with 30 years. |
| Mr. Seelig: | It's age – it's age, – it's age. |
| Mr. Squerrini: | It's senior in terms of years of service. |
| Director Fiechter: | Okay. |
| . . . . | |
| Mr. Squerrini: | I mean, severance pay is based on years of service. |
| Chairman Helfer: | Oh yeah, I meant in terms of years of service.  Oh yeah. |

---

[7] The FDIC conducted a core staffing analysis, which involved evaluating the historical data
from each division and office to identify the core work force necessary for a normal working level.

Director Fiechter:     Okay.  That's important enough to have it weighted towards the senior
                       executives, okay.

(Aug. 8, 1995, Board Tr., Pls.' Exh. 5, at 40-41.)  According to the transcripts and memos,

the "retirement eligible people are so costly to the Corporation they tend to be at the high end

of the salary scale and benefits, this proposal is to offer it . . . to them because you could save

money offering it to them over keeping them on salary."  (Id. at 42.)  The hope was that "a

program that really is tilted towards those with longer service and that's more likely to be

those who are eligible for retirement, will deal with the majority of [the] near-term problem

[of excess personnel]."  (Sept. 5, 1995, Board Tr., Pls.' Exh. 6, at 42.)

        The buyout was preferred over a reduction-in-force.  In addition to the two-year

prohibition on conducting a reduction-in-force, under the seniority rules in place, a reduction-

in-force would result in the higher-grade employees "bumping" the lower ones.  According

to then-Chairman Helfer, a RIF would give preference for persons with seniority, "which are

the people who are the highest cost . . . who really are where we have the excess" resulting

in "really outstanding employees bounced by people who have had a history of poor

performance ratings, but they've got years with them."  (Aug. 5, 1995, Board Tr., Pls.' Exh.

5, at 27.)  Adding to the cost of a RIF is that "people get to protect their salary."  (Sept. 5,

1995, Board Tr., Pls.' Exh. 6, at 45.)  "[T]he junior graded . . . individuals, those with the least

amount of experience and, in most cases, are those that you'd like to retain, are the ones who

get riffed."  (Id. at 15.)  Thus, the buyout was the more attractive option because it got rid of

the "right people," permitting the young and bright employees to move up the ranks. (Nov. 10, 1995, <u>Am. Banker</u> article, Pls.' Exh. 69.)

To increase the acceptance of the buyout option, the FDIC accompanied its offer with threats of involuntary relocation, RIFs, and downgrades in grade level. The transcripts reveal that the Board felt that without "effective deterrence" or a "stick," the buyout would have low acceptance rates and thus be ineffective at reaching its intended goals. The Board also discussed taking away certain benefits, including a locality pay. The locality pay was added to base pay in 1994. Because a retiree's annuity was based on a three-year average of pay, the Board discussed removing the locality pay to reduce the incentive for early retirees to stay through 1997 to increase their retirement annuities. However, the FDIC Legal Department cautioned them that removing this benefit could be viewed as discriminatory because it disproportionately affected older employees. The Board apparently heeded the Legal Department's advice. Ultimately, the Board voted to offer the buyout as a "carrot" to encourage voluntary attrition and make it "less attractive" to stay as a "stick." (<u>See</u> Sept. 26, 1995, Board Tr., Pls.' Exh. 9.)

The buyout was successful at reducing some areas of excess employees. (<u>See</u> May 21, 1996, Board Tr., Pls.' Exh. 10, at 14.) However, the acceptance rates for retirement-eligible and non-eligible employees were not as expected, with the acceptance rate for the buyout evenly split between the two groups. Many board members attributed this to the reluctance of retirement-eligible employees accepting a buyout before the end of 1996 because of the locality pay.

By the fall of 1996, the Board began discussing a reduction-in-force to further trim the excesses in the three divisions with the greatest overstaffing and impose directed reassignments in others.  The Board also considered consolidating the Asset Services and Resolutions divisions and field offices.  The Board approved these measures and announced them in conjunction with a new buyout program to FDIC employees on October 29, 1996. (Oct. 29, 1996, memo, Pls.' Exh. 23.)  The agency limited the ability of an employee subject to a RIF to bump another employee by defining each division and office a "separate competitive area for RIF purposes."  (Id. at 11.)

Downsizing efforts continued in 1997.  Based on updated analyses of core staffing requirements, the Board decided to close four field offices of the Division of Supervision and one of the Division of Consumer Affairs.  Staff at those offices were reassigned or accepted a voluntary buyout through a Relocation Buyout Program.[8]  Employees in four divisions were offered a new buyout program.  Further, nearly all eligible employees were offered the opportunity to participate in an early retirement program.[9]

Memos from 1998 through 2003 reflect further consolidation of departments, additional targeted buyout programs, early retirement programs, and RIFs.  However, in a January 2003 memo, John Bovenzi, FDIC CEO, reported that the agency still had approximately 200 surplus employees.  The remaining surpluses were to be subject to RIFs

---

[8] Employees who received a directed reassignment to another geographic area were permitted the option of accepting a relocation buyout in lieu of the transfer.

[9] The early retirement program was not available to employees in the divisions where there were noted staffing shortages.

in June 2003, hopefully ending nearly a decade of downsizing.  According to Plaintiffs'

statistician, 4,578 employees in Grades 11-15 separated from the FDIC between 1996 and

2003 for one reason or another.  (See Gantz Decl., Pls.' Exh. 61, ¶ 5.)  The average age at

separation was 46.  (Id.)

## B.  Merit Promotion Plan

To advance within the FDIC, employees could compete for positions through the

Merit Promotion Plan (MPP), a uniform "program designed to insure a systematic means of

selection for promotion according to merit."  5 C.F.R. § 335.103(a).  The program applies

to all permanent and temporary promotions of over 120 days and Details,[10] reassignments,[11]

or demotions to positions with known promotion potential.  See MPP, Def.'s Exh. 27; see

also 5 C.F.R. § 335.103(c).

The selection process is extensive and quite involved.  A vacancy is announced

inviting candidates to compete.  The announcement identifies the type of job, eligible grade

levels, location, and deadlines for receipt of applications.  The announcement also identifies

the qualifications for the position, specifically setting out a list of selective placement

factors[12] and quality ranking factors[13] that were established in "coordination between the

_____

[10] Details are temporary assignments to another position where the employee returns to his or her regular duties at the end of the specified period.

[11] Reassignments are essentially lateral transfers – where the employee moves from one position to another position at the same grade level.

[12] Selective placement factors are "[s]pecial qualifications that are *essential* for consideration for a position and successful job performance.  These factors (knowledge, skills, and abilities) are in addition to, or an extension of, the qualification requirements established by U.S. OPM [Office

human resource specialist and the subject matter experts in the division that has the vacancy."

(Bjorklund Dep., Pls.' Exh. 67, at 41; see also MPP, Def.'s Exh. 27, at 9-10.)

Interested candidates may then apply for the position.  The applicant must submit

either a completed application form[14] or résumé identifying the vacancy announcement

number, the applicant's most recent performance review, and any other documents specified

in the announcement.  The applicants are also encouraged to address each of the quality

ranking factors.  Once completed, the application is sent to the Office of Personnel

Management (OPM).

Applications are initially reviewed by a human resource specialist (HR specialist).

The HR specialist ensures that the applicants meet the minimum qualification standards

"prescribed or approved by the U.S. OPM and any selective placement factors prescribed by

FDIC."  (MPP, Def.'s Exh. 27, at 9, 12.)  If there are over ten applicants that are minimally

qualified for the position, the HR specialist convenes a panel of three subject matter experts.

Each member of the panel then applies the quality ranking factors to the applications by

---

of Personnel Management].  An applicant must meet the published selective placement factors in order to be considered minimally qualified for a position."  (MPP, Def.'s Exh. 27, at 1-2(V) (emphasis added).)

[13] Quality ranking factors are "[s]ignificant job-related knowledge, skills, and abilities that could be expected to significantly enhance performance in a position.  These elements help to determine those who are best qualified for the position."  (MPP, Def.'s Exh. 27, at 1-2(R).)

[14] Applications could be submitted on one of two forms created or approved by the U.S. OPM, the Application for Federal Employment SF-171 or the Optional Application for Federal Employment Form OF-612.  (See MPP, Def.'s Exh. 27, at 8.)

assigning each application a numerical score depicting the applicant's level of expertise within the factors.

The HR specialist averages the assigned scores.  Based on natural breaks in the scoring, the applicants are divided into categories of minimally qualified, well qualified, and best qualified.  The most highly qualified are placed on a "roster of eligibles" in alphabetical order and forwarded with the applications and submitted material to the selecting official. The panel's individual scores or the overall ranking of the candidates is not provided to the selecting official.

The selecting official is generally an executive-level employee (director, deputy director, associate director, assistant director, or regional manager).  Other higher-ranking employees, such as the section chief or a supervisor, often are limited to approving only lower-grade promotions or interviewing/screening candidates to a higher-level employee for selection.[15]  The power to approve a final selection ultimately depends on the delegation of authority for that particular division or office.

The selecting official reviews the applications and selects a candidate for the position. The selecting official is encouraged but not required to interview any of the candidates. Since 2002,[16] the selecting official is required to interview all of the candidates if one is

---

[15] In this sense, the selecting official and appointing official are different persons and there may be many more selecting officials than appointing officials.  However, for purposes of this Opinion, the Court uses the term "selecting official" to refer to the person with final authority to make a selection decision.

[16] In 2001, the United States District Court for the District of Columbia approved a consent decree in the case of Conanan v. Tanoue, CIV No. 00-3091 (ESH), a class action brought by

interviewed.  Prior to that time, the selecting official only had to make a "reasonable effort"

to do so.  (MPP, Def.'s Exh. 27, at 13.)  Further, since 2002, the selecting official must also

follow "standardized interview guidelines," asking the same questions of each candidate.

Ultimately, however, the selecting official has the discretion to select a candidate who the

official believes is best for the position.  The selecting official does not notify the selected

candidate.  The HR specialist coordinates the official notice and effective dates after the

candidate has received the relevant clearances and reviews.[17]

In the last half of the 1990s, the selecting official was also required to forward the

final roster (with the selected candidate identified) to the Office of Equal Opportunity (OEO).

The director of the OEO would then review the roster, and determine the race, gender,

disability code, veterans code, and age of each individual identified.  The selectee's race and

gender were then "compared to the Division's work force profile to determine if the selection

increases the diversity of the work force."  (April 17, 1996, OEO Procedures, Pls.' Exh. 33.)

Within two days, the OEO would issue one of two letters, notifying the selecting official that

the roster had been reviewed.  If a woman or minority was selected, the letter stated, "We

appreciate your efforts to diversify your work force and look forward to continuing to work

---

African-American employees alleging employment discrimination claims against the FDIC.
Pursuant to the decree, the FDIC developed written structured interview guidelines so that all
candidates for the same vacancy were treated similarly and asked the same questions.

[17] If a selecting official wished to offer a position to an individual not currently employed
by the FDIC, that selection had to be approved by the CEO.  (See May 21, 1996, Greer Letter, Pls.'
Exh. 37.)  Division and Office Directors could continue to approve selections for vacant positions
within their organizations provided they were offered to current employees and were consistent with
the approved core staffing goals.  (Id.)

with you in this regard."  In contrast, if a woman or a minority was not selected, the letter stated, "Please be aware that efforts need to be made to diversify your work force.  Your efforts in this matter are appreciated."  Copies of these letters were also sent to the "appropriate personnel office."  Further, if there were concerns regarding the selection, the OEO Associate Director would notify the selecting official and discuss the concerns.  The OEO pre-notification requirement was apparently discontinued in 2000, but at least one division continued the practice through at least 2002.

*C.  Named Plaintiffs*

    *1.  Current Employees Carroll and Melton*

Plaintiffs Billy Carroll (Carroll) and Harvey Melton (Melton) are both currently employed as Grade 13 Field Examiners in the Little Rock, Arkansas, field office of the Division of Supervision and Consumer Protection.  Carroll is 62 years old and Melton is 56.  Seven years ago, in 1998, both applied for the position of Supervisory Examiner in the Division of Supervision in Little Rock.  The position was awarded to a 32-year-old, allegedly less-qualified employee.  Subsequent to being denied the position, Carroll and Melton learned that their regional manager, Cottrell Webster, had commented at a Field Office Supervisors meeting that "one of the problems with the FDIC [is] the number of white males over 40 years old." (Carroll Aff., Pls.' Exh. 73, ¶ 6; Melton Aff., Pls.' Exh. 77 ¶ 6.) Notably, Webster sat on the ranking panel for the selection of the Supervisory Examiner position. (Melton Aff. ¶ 5.)

Carroll and Melton filed a complaint of age and race discrimination against Webster (both Webster and the selectee are African-American).  In March 2000, Carroll and Melton settled these claims.

Neither Carroll nor Melton have applied for any other jobs since 1998.  However, both allege that because of Webster's comments and their non-selection for the Supervisory Examiner's position, they have "lost confidence" in the fairness of the job selection process and have thus been "deterred" from applying for subsequent positions.

### 2.  Angela Filippini

Angela Filippini (A. Filippini) sues on behalf of her deceased husband, Vincent Filippini (V. Filippini).  A. Filippini is one of two administrators of V. Filippini's estate.[18] (See Cert. of Qualification, Pls.' Exh. 129.)

V. Filippini worked for the FDIC from 1974 until 2001.  At the time the downsizing was announced in 1995, V. Filippini held the Grade 15 position of Regional Manager, Investigations SESC.  After learning of the downsizing, V. Filippini applied for fourteen positions between December 1995 and January 1997.  Each of these positions allegedly was awarded to a substantially younger, less-qualified FDIC employee.  V. Filippini's position was eliminated in 1997, forcing V. Filippini to accept a downgrade to a Grade 14 Review

---

[18] The Certificate of Qualification does not indicate whether both administrators must consent to bringing an action on behalf of the estate or if one administrator's consent is enough.  In a subsequent declaration, however, the co-administrator indicates that she authorizes and supports A. Filippini's claim on behalf of the estate.  (Wentworth Decl. Exh. 144, Dkt. No. 120, at 10.)

Examiner position in the Division of Supervision in Washington, D.C., one of two positions for which he was selected. At the time of his downgrade, V. Filippini was 60 years old.

V. Filippini continued to apply for other available FDIC positions. From October 1997 to August 2001, he applied for ten positions, Grade 14 and above, each of which was allegedly awarded to a substantially younger, less-qualified FDIC employee. V. Filippini held the position of Review Examiner until his death on December 24, 2001.

### 3.  Former Employees

#### a.  Rodney Wade

Rodney Wade is a former FDIC lawyer. In 1997, Wade was stationed in the Atlanta, Georgia, field office, when the office underwent a reduction-in-force and Wade was involuntarily terminated. Prior to his termination, Wade applied for "over fifty positions"[19] for which he was qualified but not selected. For many of those positions, a substantially younger, less qualified employee was allegedly selected. (Wade Aff., Pls.' Exh. 79, ¶ 5.) Specifically, Wade complains that he was not selected in August 1997 for one of three Grade 14 senior attorney positions in the Legal Division in Dallas, Texas. Although Wade had only been with the FDIC for seven years, he had practiced law for 25 years at this point. One of

---

[19] Wade has only identified three positions for which he applied (positions in Atlanta, Dallas, and Memphis). Defendant has been able to identify twenty-one from its records. The Complaint is unclear whether Wade is complaining of his non-selection to all 50 positions (most of which remain unidentified), the three covered in his EEO complaint, or just the Dallas position(s).

the selectees, Mr. Golden, had practiced law for only five years.[20]  Further, Wade alleges that

he was ranked higher than Mr. Golden in their respective performance appraisals.

Wade filed a complaint with the Merit Systems Protection Board, alleging age, race,

and sex discrimination for his non-selection for the Dallas position and age and sex

discrimination in his non-selection for a position in Atlanta.  Finally, Wade complained that

he did not receive a position in Memphis in retaliation for exercising his protected rights.

Although the record is somewhat unclear on this point, it appears that Wade's Complaint was

dismissed on Jan. 9, 1998, for lack of jurisdiction.[21]  See Wade v. FDIC, No. AT-0351-97-

1006-I-1, 1998 WL 1986095 (Jan. 8, 1998).  His appeal was denied on July 7, 1998.  80

M.S.P.R. 470 (1998) (table).

On January 1, 1999, Wade contacted an EEO counsel regarding his claims of

discrimination.  (EEO Counselor's Report, Def.'s Exh. 34(G), ¶ 8b.)  In his EEO complaint,

Wade identified Jack Rosenberg, Plaintiffs' counsel, as a witness because he was a former

FDIC attorney who was also "downsized."  After Wade was issued a Notice of Right to File

---

[20] There were apparently three positions open. And, although the evidence is less than clear on this point, it appears that Wade may have been only eligible to compete for one of these positions as the remaining positions were not part of the MPP, but rather were awarded based on seniority. Buttressing this conclusion is the fact that Wade refers only to the selection of Mr. Golden in the motion for class certification.

[21] The Merit Systems Protection Board dismissed the complaint because it found that the grievance procedures outlined in the collective bargaining agreement between the agency and the NTEU constituted the sole means for reviewing a separation caused by a RIF.  Wade v. FDIC, 1998 WL 1986095.  The Board further held that it did not have jurisdiction to review claims of discrimination based on age, sex, and race.  Id.

a Formal Complaint (and presumably did file), the FDIC issued a Report of Investigation.[22] The Complaint was under review by the Dallas Equal Employment Opportunity Commission when Administrative Law Judge Stephanie Merkel held the complaint in abeyance pending an agency decision regarding a class complaint filed by V. Filippini.

In 1997, Wade also filed a grievance through the National Treasury Employees Union (NTEU) challenging the procedures used in the reduction-in-force.  He does not appear to challenge the denial of his grievance in this action.

### b.  Marvin Armstrong

Marvin Armstrong worked for the FDIC nearly continuously from 1965 until his retirement in September 2002.  Throughout the 1990s, he was a field office supervisor, most recently in Oklahoma City.[23]

In July 2002, the FDIC announced that it was reorganizing the Department of Supervision field offices and changing the existing FOS position to a "new" position called Field Supervisor (FS).  According to Armstrong, the new FS position was not substantively different than the old FOS position.  However, all existing field office supervisors were required to compete for the new FS positions.

---

[22] Only two pages of this report have been provided to this Court.  Because the complaint process continued on until at least 2001, the Court concludes that this report did not resolve Wade's complaint to his satisfaction.

[23] Armstrong was selected to the Grade 14 field office supervisor (FOS) position in Oklahoma City in 1996.  At the time he was 54 years old.

Not wanting to uproot his family, Armstrong only applied for the FS position in Oklahoma City. He was interviewed for this position but was not selected. The selectee was an employee who was seven to ten years younger than Armstrong.[24] However, Armstrong admits the selectee was well-qualified for the position.

Shortly after being notified that he had not been selected for the Oklahoma City FS position, Armstrong received an email indicating that the FDIC had begun the process of reassigning him and asking for his preference in possible locations. A directed reassignment (to the location of the FDIC's choosing) would have permitted Armstrong to retain his grade and salary level, whereas a competitive posting in a location selected by Armstrong could have involved a downgrade. Armstrong was given only two business days to make his decision regarding how to proceed. Armstrong, however, would not consider any of the other positions because it would force him to relocate. Thus, he elected to take the then-offered buyout and retire.[25]

---

[24] Armstrong was 60 years old at the time of his non-selection. In Armstrong's affidavit, Armstrong estimates the selectee to be about 10 years younger. However, in his deposition, Armstrong acknowledges that the selectee graduated high school seven years after Armstrong.

[25] Defendant alleges that Armstrong accepted a buyout worth approximately $67,000 in addition to his normal retirement and other benefits. Defendant did not cite to any evidence to support this figure.

### c.  Ellis Hopper

Ellis Hopper worked for the FDIC from 1974 until his retirement in September 2002. Like Armstrong, he was a Grade 14 FOS in the Division of Supervision (DOS).  Because of the reorganization of the DOS field offices, Hopper was required to compete for the "new" FS positions.  Hopper applied for FS positions at both the Grade 14 and 15 levels.  Hopper was not referred for the Grade 15 positions, but was referred for those at Grade 14.  Hopper was not selected for any of the positions, each having been given to employees who were younger than him and allegedly less qualified.[26]

Hopper was given the same choice as Armstrong – accept a directed reassignment at the same grade and pay level, or compete for a preferred location that may or may not be at the same grade and pay level.  Hopper was given only two days to decide whether to stay with the FDIC and accept one of the options presented.  Hopper elected to accept a $56,000 buyout (equal to half of his current salary) and retire.

### d.  Doris Marsh

Doris Marsh was employed at the FDIC for nearly twenty-five years.  At the time of her retirement in September 2002, Marsh was a Grade 15 Examination Specialist in the

---

[26] It is not clear at this point whether the persons who were awarded the positions were *substantially* younger than Hopper.  Of the eight selectees for the Grade 14 positions, six were over the age of 40.  Hopper was 51 at the time of the non-selection.

Office of Policy and Accounting Section of the Division of Supervision and Consumer Protection[27] (DSC) in Washington, D.C.

During 1996 to 2002, Marsh applied for four management positions at the E1 and E2 levels in the DOS and DSC. Each of these positions was awarded to a younger, allegedly less-qualified employee.[28] Marsh also contends that she was never selected for short-term programs called "Details," which provided needed experience for those wishing to "move up the ladder."[29] Frustrated when she learned of her non-promotion in June 2002 to the Associate Director of Policy position, Marsh concluded her future with the FDIC was limited. Marsh elected to accept a buyout of $70,000, equal to half a year's salary, and retire, which she did on September 28, 2002.

### e. Curtis Vaughn

Vaughn began working for the FDIC in 1971. He was promoted several times throughout his career, eventually landing the role of Grade 15 Senior Examination Specialist in the DSC. In 2001 and 2002, Vaughn applied for eight different positions at the Grade 15 or E1 level. Notably, he competed against Marsh and Filippini for some of those positions.

---

[27] This division was created through the consolidation of the Division of Supervision and the Division of Compliance and Consumer Affairs.

[28] Three of the four positions were awarded to employees over the age of 40. However, the employees were between eight and twelve years younger than Marsh.

[29] Marsh alleges that the Detail program was created in response to the "young people's" frustration that they could not move ahead in the organization because of the lack of open positions.

In each case, Vaughn alleges that a significantly younger, allegedly less-qualified employee was selected.[30]

Vaughn also applied for numerous Details or temporary assignments by submitting an Expression of Interest (EOI).[31]  Several of these assignments included section chief assignments, which would have given Vaughn direct and necessary experience for a permanent section chief position.  However, Vaughn contends that the Detail positions often were awarded to employees who were younger and less qualified.

Vaughn recently served on a ranking panel.  According to Vaughn, the process was "fairly structured," but allows for unfairness "once it get[s] to the interview" with the selecting official.  (Vaughn Dep., Def.'s Exh. 33, at 65-66.)  Vaughn complains that both the selecting process is defective and the selecting officials making the decisions have not done so in good faith.  (Id. at 68.)

## DISCUSSION

### A.  Class Claims

In addition to asserting individual claims of discrimination, Plaintiffs also advance two class claims of age discrimination.  Plaintiffs first allege that Defendant engaged in a pattern-or-practice of discrimination against older workers in denying them promotions and

---

[30] In his deposition, Vaughn admits that one of the selectees, Mr. McNamara, was older than he.  Another selectee, Mr. Fritts, was only three years younger than Vaughn.

[31] Employees would submit an EOI announcement to express their interest in being considered for a non-competitive lateral reassignment, Details, or temporary assignment opportunities.

forcing them to quit.  Plaintiffs' second argument is that the FDIC's promotion practice has a disparate impact on older employees.

Plaintiffs' claims are an "across the board" challenge to Defendant's promotion practice.  Plaintiffs have clarified in their Reply that they complain only of the final selection stage of the MPP, thus their claim is not an "across-the-board" challenge in the sense that Plaintiffs seek to represent class members suffering from a wide variety of discriminatory practices.  However, the proposed class still "cuts across employment status, job categories, facilities and geographic regions.  The class claims, therefore, are by definition 'across-the-board.'"  Webb v. Merck & Co., Inc., 206 F.R.D. 399,  404 n.1. (E.D. Pa. 2002); see also Black's Law Dictionary 24 (7th ed. 1999) (defining "across-the-board" as "applying to all classes, categories, or groups").

The Supreme Court has "'pulled in the reins on across-the-board'" employment discrimination claims.  Zapata v. IBP, Inc., 167 F.R.D. 147, 158 (D. Kan. 1996) (citation omitted).  In Falcon, 457 U.S. at 157, the Court recognized that "racial discrimination is by definition class discrimination" but that "the allegation that such discrimination has occurred neither determines whether a class action may be maintained in accordance with Rule 23 nor defines the class that may be certified."  Plaintiffs must make "'a specific showing of underlying facts which might raise an inference of a common question of [a] pattern and practice'" of discrimination, Zapata, 167 F.R.D. at 158 (quoting 5 Newberg on Class Actions § 24.21 (3d ed. 1992)), and that the discriminatory policy is reflected in other divisions,

locations, etc., in the same way it is in those represented by the named Plaintiffs.  See 1 Newberg on Class Actions § 3:17 (4th ed. 2002).

### 1. Pattern-or-Practice of Disparate Treatment

Plaintiffs' pattern-or-practice theory is two-fold.  First, Plaintiffs contend that the Defendant denied promotions to the older workers.  According to Plaintiffs, the Board's policy of ageism is carried out by indoctrinating the selecting officials and then permitting them to exercise total discretion in selecting younger employees for positions available through the MPP.  Defendant could ensure that selecting officials were following through on the discriminatory policy by (1) requiring that the OEO concur on all selectees; and (2) using the selecting official's adherence to the agency's affirmative action policy as relevant criteria in evaluating that official's performance.[32]  Second, Plaintiffs allege that the lack of opportunity for older workers led to an unwelcome work environment, essentially forcing these workers to accept the buyout programs and retire.  Plaintiffs contend that the pattern-or-practice affected (1) those who applied for positions through the MPP, were classified as highly qualified on the roster of eligibles but were not selected for the position; (2) others who would have applied but were deterred by the lack of opportunities; and (3) those who were constructively discharged.

---

[32] In their supplemental brief, Plaintiffs also argue that the ranking process is subjective, as the criteria applied were "intangible, non-quantifiable factors" and the ranking panelists were not provided any written guidelines in how to apply these factors to the applications and come up with a score.  However, Plaintiffs clarify in their Reply that they are not complaining that these processes were discriminatory.

"Pattern-or-practice cases differ significantly from the far more common cases involving one or more claims of individualized discrimination." Thiessen v. Gen. Elec. Capital Corp., 267 F.3d 1095, 1106 (10th Cir. 2001). Generally, pattern-or-practice cases proceed in two stages, with the first stage placing the burden on the plaintiff to prove the existence of a discriminatory practice. Id. Most often, the plaintiff will attempt to establish this pattern through statistical evidence and anecdotal evidence of specific instances of discrimination. Webb, 206 F.R.D. at 402-03. In the second stage, the defendant must rebut the presumption of discrimination for each potential victim and prove that the individual was not subjected to the discriminatory practice. Thiessen, 267 F.3d at1106. "'The second stage of a pattern and practice claim is essentially a series of individual lawsuits, except that there is a shift of the burden of proof in the plaintiffs' favor.'" Id. at n.7 (quoting Newberg on Class Actions § 4.17 (3d ed. 1992)). Mere allegations of a pattern-or-practice of discrimination, however, do not necessarily entitle the Plaintiffs to certification. Thiessen, 267 F.3d at 1108 ("We do not hold that whenever there is evidence of a pattern-or-practice, a class must be certified.").

### 2. *Disparate Impact*

Just this term, the Supreme Court decided that employers may be sued under the ADEA for actions that have a disparate impact on older workers, Smith v. Jackson, Miss., ___ U.S. ___ , 125 S. Ct. 1536, 1544 (2005), effectively overruling Tenth Circuit precedent. See Ellis v. United Airlines, Inc., 73 F.3d 999, 1007 (10th Cir. 1996) (holding that the ADEA does not permit disparate impact claims). The scope of a disparate impact claim under the

ADEA is more limited than that available under Title VII, however.  Id.  Plaintiffs must identify a particular employment practice that has caused the disparate impact:  evidence of a disparate impact or a generalized policy is insufficient.  Smith, ___ U.S. ___, 125 S.Ct. at 1545.  Additionally, Plaintiffs cannot recover if the identified employment practice discriminates based on a reasonable factor other than age.  Id.

Plaintiffs' disparate impact claim challenges only the subjectivity of the MPP selection process.  According to Plaintiffs, the final selection from the roster of eligibles is completely subjective and this subjectivity had an adverse impact on older workers, as evidenced by Plaintiffs' statistical analysis.  Because Plaintiffs' disparate impact claim focuses solely on the subjectivity of the MPP selection process, the only potential class members for this claim are those who applied and were otherwise highly qualified but were not selected in lieu of a younger, less-qualified person, and those who were qualified but were deterred from applying.[33]  See Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 365-66 (1977) (recognizing that victims of discriminatory policy relating to hiring and selection include those who desired jobs but were intimidated and discouraged from applying).

---

[33] The class would not encompass those with strictly constructive discharge claims.

*B.  Rule 23(a) Factors – Non-selection and Deterrence Classes*

*1.  Numerosity*

Rule 23(a) requires that the putative class be so numerous that joinder is impracticable.  Plaintiffs claim that they meet the numerosity requirement because the number of persons negatively impacted by the MPP is at least 500.[34]  This number includes all employees 40 years of age or older who applied for a vacancy that was ultimately filled by a person who was at least five years younger and under the age of 40.  Therefore, the sheer number of persons affected satisfies the numerosity requirement, according to Plaintiffs.

To establish a prima facie case under the ADEA for a failure to select, Plaintiffs must show:  (1) that they belong to a protected class – i.e., age 40 and older; (2) that they were qualified for the position; (3) they were not awarded the position; and (4) the position was awarded to a *substantially younger* person.  See O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 311-13 (1996); Munoz v. St. Mary-Corwin Hosp., 221 F.3d 1160, 1165-66 (10th Cir. 2000).  It is not necessary that the person awarded the position be under the age of 40.  O'Connor, 517 U.S. at 313.  This Court has previously held that a seven-year age difference, alone, is insufficient to raise an inference of discrimination based on age.  See Perry v. St. Joseph Reg. Med. Ctr., 110 Fed. Appx. 63, 67 (10th Cir. 2004) (affirming

---

[34] This number appears to only include those of the first potential subclass – persons over age 40 who applied and were referred for positions ultimately awarded to a substantially younger person. Dr. Gantz does not estimate the number of persons allegedly deterred.  However, because a deterrence claim could not survive without the non-selection claim, the analysis for the non-selection claim will apply to both.

without addressing the Court's conclusion regarding the age difference). Perhaps anticipating this problem, Plaintiffs' expert also presents a table identifying 563 older employees applying for positions awarded to those eight years younger (regardless of whether the selectee was under the age of 40) and 479 older employees not selected in favor of those ten years younger.

Plaintiffs' estimates on class size include all applicants age 40 or older, qualified or not, referred or not. (See Gantz Decl., Pls.' Exh. 61, ¶¶ 6-7.) Although the proposed class is comprised of applicants from the "logically contiguous comparisons that form a block of grades in a year or a run of years for a grade" with an overall advantage for referred applicants under the age of 40 (Gantz Report, Pls.' Exh. 62, at 10), it is not actually limited to referred applicants in those blocks and runs, but includes *all* applicants in the blocks and runs who were age 40 or older. (Gantz Decl., Pls.' Exh. 61, ¶ 7.) The inclusion of all applicants in estimating class size, instead of only *referred* applicants, was error.

Although Plaintiffs cannot merely allege that they meet the numerosity criteria, they are not required to demonstrate the precise number of potential class members. See Evans v. U.S. Pipe & Foundry Co., 696 F.2d 925, 930 (11th Cir. 1983). Because it appears that the number of referred applicants likely would be numerous enough to make joinder impracticable, the Court will presume that the numerosity requirement has been satisfied. See Allen v. Chicago Transit Auth., Case No. 99 C 7614, 2000 WL 1207408 (N.D. Ill. July 31, 2000) (holding that court is able to make "common sense assumptions" when determining

numerosity); <u>see also</u> 1 <u>Newberg on Class Actions</u> § 3.5 (4th ed. 2002) (noting that a presumption that joinder is impracticable arises with classes of at least 40 members).

### *2. Commonality and Typicality*

Commonality exists when all plaintiffs share at least one common issue of law or fact. <u>J.B. *ex rel.* Hart v. Valdez</u>, 186 F.3d 1280, 1288 (10th Cir. 1999). Although commonality focuses on the characteristics of the class, typicality "focus[es] instead on the desired characteristics of the class representative." 1 <u>Newberg on Class Actions</u> § 3:13 (4th ed. 2002). The Court applies the typicality criteria to determine whether there is a relationship between the common class claims and those asserted by the Plaintiffs. <u>Id.</u> In this regard,

> [t]he commonality and typicality requirements . . . tend to merge. Both serve as guideposts for determining whether, under the particular circumstances, maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.

<u>Falcon</u>, 457 U.S. at 158 n.13.

Despite argument by Defendant to the contrary, the presence of unique claims or defenses does not necessarily defeat commonality and typicality. <u>See</u> <u>J.B.</u>, 186 F.3d at 1288. Further, in a pattern or practice case, "highly individualized" defenses may not be central to the litigation until the second stage, as the first stage focuses solely on the existence of a pattern or practice. <u>Thiessen</u>, 267 F.3d at 1107.

Since <u>Falcon</u>, litigants typically attempt to certify across-the-board claims by arguing that the employer engaged in a company-wide practice of discrimination and that the discrimination manifested itself through "entirely subjective decisionmaking processes."

28

Falcon, 457 U.S. at 159 n.15. Plaintiffs are no different. However, Plaintiffs have neither identified a company-wide practice of discrimination nor demonstrated that the processes utilized by Defendant in making promotion decisions were entirely subjective.

Plaintiffs applied for positions through the MPP, the procedure governing competitive selections. Although the MPP is a uniform procedure, it does not involve centralized decision-making. Absent centralized decision-making or some other identifiable common "practice" of discrimination, any acts of discrimination suffered by the Plaintiffs through their non-selection cannot be construed as company-wide.[35]

The final selections were made by various selecting officials in numerous different divisions and geographical regions. For instance, in the Division of Supervision and Consumer Protection (which was formerly two separate divisions), no less than twenty-seven persons in eight different states can act as selecting officials for those Grade 14 and lower and at least six can select for positions higher than Grade 14. (Compare Pls.' Exh. 58 (Delegations of Authority) with Pls.' Exh. 1 (FDIC Organizational Directory).) Presumably, prior to the merger of the two divisions and during the time period relevant to many of the Plaintiffs, there were more persons with this authority. In the Division of Resolutions and Receiverships, ten persons have authority to select or approve selections to all Grade levels. Clearly, the authority to select the putative class members for vacancies was not centralized,

---

[35] The ADEA, like Title VII, prohibits discriminatory employment *practices*, not an abstract policy of discrimination." Falcon, 457 U.S. at 159 n.15.

but was spread among numerous persons in the fourteen divisions and eight regional or area offices of the FDIC.[36]

There is also no evidence of coordination between the selecting officials. Plaintiffs argue that division-level executives attended board meetings in which the FDIC's policy of ageism was openly discussed and were thus indoctrinated. According to Plaintiffs, this indoctrination resulted in coordinated efforts to prevent the promotion of older workers. The evidence simply does not support Plaintiffs' claims. First, Plaintiffs refer to only two meetings in which some associate directors were present where the alleged indoctrination took place. (See Pls.' Br. at 23.) Notably, the executives attending these meetings are only a few of many selecting officials who made promotion decisions at that time, much less the ten-year span encompassed by Plaintiffs' claims. Second, the discussions in the meetings do not mention anything regarding promotion, but instead center around buyout options and downsizing. Finally, the fact that, on other occasions, a division director or associate director may have made disparaging remarks regarding older workers "blocking" opportunities for advancement does not support an inference of indoctrination of all selecting officials into a

---

[36] Plaintiffs assert that the CEO had to approve all selections pursuant to a May 21, 1996, letter, thus centering the decision-making authority in one person. (See May 21, 1996, Greer Letter, Pls.' Exh. 37.) However, the letter relied on by Plaintiffs does not support this assertion. The letter does not require approval of all selections, but rather requires approval of selections where the selected person was an individual not currently employed with the FDIC. (See id.) Importantly, non-FDIC employees are not members of the putative class. Division and Office Directors continued to approve selections for vacant positions within their offices where the selected person was a current employee. (Id.)

policy of ageism that resulted in a coordinated effort by those officials to block selection of otherwise qualified older workers.

Concerted decision-making is also not evidenced by the OEO's classification and tracking of the age of selected employees.  The OEO classified and tracked the selection and non-selection of candidates by making a schedule for each position that identified the referred candidates by, among other things, their age.  This schedule was created after the selecting official had made the selection, but before the selectees were notified.  Plaintiffs have not presented any evidence that anyone outside of OEO ever saw these schedules.  Whether the selecting official received the letter of thanks for attempting to diversify the workforce or one encouraging diversification depended on the selectee's sex and race, not age.  Absent some suggestion of control over the selecting officials' decisions by the OEO, the presence of the OEO reporting policy does not transform the individual decisions of the selecting officials into a centralized and uniform practice.

Finally, there is no evidence that selecting officials were given incentives to discriminate against older workers.  Plaintiffs assert in their brief that selecting officials are evaluated and compensated based on their selection decisions, thus permitting the FDIC to ensure compliance with its policy of discrimination against older workers.  The evidence cited by Plaintiffs indicates that the FDIC supervisors are evaluated on, among other things, their commitment to the agency's affirmative action goals, which are to have a workplace free of discrimination.  (See Bjorklund Dep. at 75-77.)  There is *no* evidence of evaluation or compensation based on compliance with a policy of discrimination.  Additionally, there

is a complete absence of evidence that a single selecting official felt pressured to "re-select" a younger employee because of pressure from the OEO or because the official was being evaluated based on compliance with the agency's affirmative action plan, much less any evidence of a pattern or practice of such behavior.

Without evidence of centralized decision-making, Plaintiffs have not identified a unified, single promotion practice common to all plaintiffs. See Abrams v. Kelsey-Seybold Med. Group, Inc., 178 F.R.D. 116, 133 (S.D. Tex 1997). Plaintiffs' class would include all older employees in fourteen divisions or offices, in at least eight different regions of the country, in various different positions and grade levels; employees who applied, collectively, for more than a thousand jobs over a ten-year period of time, each job subject to selection by one of potentially hundreds of selecting officials. Such "decentralized, individualized decision-making [is] fatal to Plaintiff's ability to set forth a common claim of promotion discrimination." Stubbs v. McDonald's Corp., 224 F.R.D. 668, 675 (D. Kan. 2004); Lott v. Westinghouse Savannah River Co., Inc., 200 F.R.D. 539, 555-56 (D.S.C. 2000) (finding that diversity of employment decisions and absence of centralized decision-making compels court to find lack of commonality).

If the Court focused, as Plaintiffs wish, not on the decision-making process but rather on the delegation of decision-making authority to the selecting officials, Plaintiffs still could not establish commonality for their across-the-board challenge. Plaintiffs claim that Defendant has a policy of subjective, highly discretionary decision-making that discriminates against older workers in job selection and promotion. Plaintiffs argue that the subjectivity

is evidenced by the fact that the selecting officials had no objective criteria or standards by which to select a candidate. Plaintiffs contend that the statistical evidence demonstrates that this subjectivity had a discriminatory impact on employees age 40 or older.

Plaintiffs have not established that the FDIC has a completely subjective decision-making promotion policy. The MPP does not vest the selecting officials with limitless discretion. The selecting official reviews the highly-qualified applicants and compares their applications and other submitted materials with the quality ranking factors, decides whether to conduct interviews, and then makes a decision. Although the selecting official exercises discretion, that discretion is not unfettered. The selection process is based, at least in part, on identifiable criteria. The use of discretion in applying that criteria does not render the process "entirely subjective." See Webb, 206 F.R.D. at 407; Betts v. Sundstrand Corp., Case No. 97 C 50188, 1999 WL 436579 *6 (N.D. Ill. 1999) (holding that even a generally subjective process won't meet Rule 23's objectivity requirement when there are some objective factors present in the decision-making process).

Plaintiffs' claim is not assisted by their statistical reports. Statistical evidence of underrepresentation is, by itself, insufficient to establish commonality. See generally, Falcon, 457 U.S. 147; see also Anderson v. Boeing Co., 222 F.R.D. 521, 536-37 (N.D. Okla. 2004) (noting that the Tenth Circuit requires more than just statistics to establish a prima facie case of disparate impact).[37]

---

[37] Defendant challenges Plaintiffs' analysis on many grounds and presents his own expert to rebut Plaintiffs' expert's conclusions. Notably, the Defendant has challenged whether Plaintiffs'

For many of the same reasons Plaintiffs fail to establish commonality, they also fail to meet the typicality requirement. Individual acts of discrimination are relevant in a pattern or practice claim to support the existence of a common scheme. As discussed above, Plaintiffs have not identified such a scheme. The named Plaintiffs' claims, although perhaps similar to those of other employees, are merely individual claims for relief and are not typical of all FDIC employees regardless of time, job grade, division, and geographical region. See Falcon, 457 U.S. at 158 (evidence of discrimination against one plaintiff does not necessarily justify inference that such discriminatory treatment is typical).

### 3. Adequacy of Representation

Rule 23(a)(4) requires that the named Plaintiffs adequately and fairly represent the class. The Court gives special scrutiny to this factor because of due process concerns implicated in binding absentee class members to a final judgment. See Zapata, 167 F.R.D. at 161. "'Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'"[38]

_____

expert has truly compared "similarly situated employees." Because of the difficulties in making such a determination without addressing the merits and because evidence of a statistically significant disparity is not sufficient, by itself, to meet the commonality requirement, the Court declines to address the question at this juncture.

[38] Although the legal adequacy of counsel may still be quoted as part of the analysis under Rule 23(a)(4), Fed. R. Civ. P. 23 was amended in 2003 to separate the two inquiries. See Fed. R. Civ. P. 23(g) advisory committee's note (2003). "Rule 23(a)(4) will continue to call for scrutiny of the proposed class representative, while [Rule 23(g)] will guide the court in assessing proposed class counsel as part of the certification decision." Id. Therefore, the Court addresses only the legal adequacy of the class representatives in this section and separately addresses issues relating

Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d 1180, 1187-88 (10th Cir. 2002) (quoting

Hanlon v. Chrysler Corp., 150 F.3d 1011, 1020 (9th Cir. 1998)).

This case is fraught with potential conflicts of interest between the named

representatives and the putative class. First, several of the Plaintiffs competed for the same

jobs. For instance, Plaintiffs Carroll and Melton both competed for the Supervisory

Examiner position in Little Rock. During the late 1990s and early 2000s there was an

expanding pool of potential applicants and a diminishing pool of positions in the FDIC. In

such a situation, the potential for conflict among applicants is obvious. See Lott, 200 F.R.D.

at 562 (noting "serious conflicts" where plaintiffs were not selected in favor of putative class

members). Second, several of the named Plaintiffs were actually selected for positions

through the MPP during the relevant period, thus creating a potential conflict with those class

members who applied for or were deterred from applying for those particular positions. For

example, both Armstrong and Vaughn competed for, and were awarded, positions in 1996,

the year Dr. Gantz identified as having the highest incidence of age discrimination. (See

Gantz Report, Pls.' Exh. 62, at 9 (table 8).) The Supreme Court has recognized that "[i]n

employment discrimination litigation, conflicts might arise, for example, between employees

and applicants who were denied employment and who will, if granted relief, compete with

employees for fringe benefits or seniority. Under Rule 23, the same plaintiff could not

represent these classes." Gen. Tel. Co. of the Nw., Inc. v. EEOC, 446 U.S. 318, 331 (1980).

---

to class counsel below.

Third, there is a potential for conflict between the former employees and current employees, as the former employees may focus on the potential for monetary relief because they would not benefit from the injunctive relief sought by the current employees.  Elkins, 219 F.R.D. at 423.

There are also reasons to question whether Plaintiffs will vigorously prosecute this suit.  For instance, Defendant has asserted several defenses unique to certain of the named Plaintiffs.  Defendant asserts that Carroll and Melton are barred from bringing their claims because they signed a settlement agreement that would encompass this action.  Defendant asserts that Wade is precluded from relitigating his claims because of his previous pursuit of these claims through the grievance process.  The presence of such defenses suggests that these Plaintiffs may be focused primarily on the issues in their own cases instead of litigating those applicable to the entire class.  Similarly, Defendant has questioned whether A. Fillipini, who has no independent knowledge of the underlying facts, is an appropriate representative in such a fact-intensive case.

The Court does not opine whether any one of the problems noted above could independently justify denial of certification for lack of adequacy, especially given the unique nature of a pattern-or-practice claim.  However, because the conflicts are numerous and varied, the Court cannot conclude that the absentee class members are assured of adequate representation.  Thus, the Court finds that Plaintiffs have not met the requirements of  Rule 23(a)(4).

*C. Rule 23(a) Factors – Constructive Discharge*

In their Reply, Plaintiffs request that the Court consider subclass certification should certification of the entire class be inappropriate. Having determined that the subclasses of non-selection and deterrence claims do not satisfy the requirements of Rule 23(a), the Court turns to Plaintiffs' constructive discharge claims.

Hindering the Court's analysis on Plaintiffs' constructive discharge claims is the absence of argument from Plaintiffs regarding how the Rule 23(a) factors apply to these claims. However, the Court determines that the constructive discharge subclass does not satisfy Rule 23(a). First, Plaintiffs have not presented sufficient information from which the Court could determine the potential size of the putative subclass. Therefore, Plaintiffs have not satisfied the numerosity requirement. See Williams v. Boeing Co., 225 F.R.D. 626, 637 (W.D. Wash. 2005). Second, whether constructive discharge claims are amenable to resolution through a class action seems highly suspect. Constructive discharge claims are very workplace specific, requiring considerations of the conditions of each environment to determine if the conditions were so intolerable that a reasonable person would feel compelled to resign. See Exum v. U.S. Olympic Comm., 389 F.3d 1130, 1135 (10th Cir. 2004). Here, the sheer number and diversity of environments involved in the putative nationwide class belie any suggestion of commonality and typicality. Accordingly, Plaintiffs' proposed subclass of FDIC employees allegedly constructively discharged is not appropriate for certification under Rule 23(a).

### D.  Rule 23(b)

Even assuming Plaintiffs could satisfy the requirements of subsection (a), they cannot satisfy the requirements of Rule 23(b)(2) or (b)(3).

### 1.  Certification Under Rule 23(b)(2)

Plaintiffs contend that they are seeking primarily injunctive and declaratory relief. In their Complaint, Plaintiffs seek a declaration that Defendant's conduct constituted age discrimination and an injunction barring Defendant from continuing its pattern of discrimination.[39]   In their motion for certification, Plaintiffs narrow their request. Specifically, Plaintiffs wish to require the "imposition of objective criteria to govern job selection in Grades 11-15, E-1 and E-2, the elimination of the defendant's use of subjective criteria in job selection in [the respective grades], the removal of job applicant's high school graduation date on their personnel forms . . . and oversight of job selection by a court-appointed monitor . . . ."  (Pls.' Br., Dkt. No. 77, at 56.)

Plaintiffs cannot satisfy Rule 23(b)(2) because they have not identified a particular discriminatory policy applicable to the entire class and because they are seeking predominately money damages, not injunctive relief.  Additionally, the Court notes that injunctive relief in this context raises some manageability concerns.

A generalized policy of non-compliance with the law is not a proper basis for injunctive relief.  Monreal v. Potter, 367 F.3d 1224, 1236 (10th Cir. 2004).  The proposed

---

[39] Plaintiffs also seek reinstatement, where appropriate.

injunctive relief requested in Plaintiffs' brief applies only to the MPP.  It would not provide relief for Plaintiffs who were allegedly constructively discharged.[40]  As previously discussed, there is no evidence linking the acts of discrimination across time, divisions, and geographical limitations into an identifiable company-wide practice.  Clearly the "breadth and discontinuity of the acts of discrimination alleged here reveal how ill-suited a class-wide injunction would be that would satisfy the requirements of Rule 65."  Id. at n.11.

Additionally, the case presents troubling questions regarding manageability.  See Shook v. El Paso County, 386 F.3d 963, 973 (10th Cir. 2004), cert. denied, ___ U.S. ___, 125 S.Ct. 1869 (2005) (deciding that manageability is relevant under (b)(2)).  Absent an identifiable company-wide practice of discrimination, it is difficult to envision an injunction that could rectify the alleged discrimination.  See Monreal, 367 F.3d at 1236. Additionally, the Court is troubled with the question of whether the former employees have standing to bring claims for injunctive relief.  The two named Plaintiffs who are current employees of Defendant are subject to unique defenses – defenses which, if successful, could result in no single named Plaintiff with standing to pursue the injunctive relief.[41]  Although the Court could *assume* that other plaintiffs would come forward and seek to be substituted, "courts are not obligated to certify classes on the basis of logical assumptions.  It is neither practical nor

---

[40] Defendant also argues that Plaintiffs' first two requests for injunctive relief are moot because they are already in place pursuant to the consent decree in Conanan.

[41] Of course, the Court is not offering any opinion about either the standing issue or the potential success of the defenses asserted against Carroll and Melton.  It is merely observing that the issue of standing could create problems of manageability.  Further, it raises a question whether injunctive relief is truly the predominate form of relief sought by Plaintiffs.

prudential to engage the powerful machinery of a class action on the basis of a hypothetical."
Reed, 849 F.2d at 1311.

The fact that Plaintiffs seek monetary relief in addition to injunctive relief does not automatically make certification under section (b)(2) inappropriate.  See Boughton, 65 F.3d at 827.  Indeed, Plaintiffs assert that back pay damages are often more readily amenable to a uniform group remedy.  See Pettway v. Am. Cast Iron Pipe Co., 494 F.2d 211, 256-58 (5th Cir. 1974).

However, even assuming this generalization would hold true in an across-the-board case like this one, it would not apply to the calculation of front pay.  The amount of front pay cannot be arbitrarily set, it must be based on factors individual to each employee.  Davoll v. Webb, 194 F.3d 1116, 1143-44 (10th Cir. 1999).  Numerous factors are relevant in assessing front pay including work life expectancy, salary and benefits at the time of termination, any potential increase in salary through regular promotions and cost of living adjustment, the reasonable availability of other work opportunities, the period within which a plaintiff may become re-employed with reasonable efforts, and methods to discount any award to net present value.  Shore v. Fed. Exp. Corp., 777 F.2d 1155, 1160 (6th Cir. 1985).  A court may also consider a plaintiff's future in the position from which he was terminated.  See Suggs v. ServiceMaster Educ. Food Mgmt., 72 F.3d 1228, 1234 (6th Cir. 1996).  A front pay award should reflect the individual circumstances of the plaintiff and the employer.  Id. at 1144.  When the Court must conduct additional proceedings to determine the scope of individual relief, the request for damages is not incidental to the requested relief.  See Morgan, 169

F.R.D. at 358.  The calculation of damages in this case raises questions of manageability and casts doubt on whether injunctive relief is truly the predominate relief sought.  Because it appears that the relief sought is primarily money damages and injunctive relief would not provide relief to the entire class, certification under (b)(2) is improper.[42]  See Fed. R. Civ. P. 23(b)(2) advisory committee's note (1966) (noting that subsection (b)(2) "does not extend to cases in which the appropriate final relief relates . . . predominantly to money damages").

### 2.  Certification Under Rule 23(b)(3)

To be certified as a class action under section (b)(3), the action must have "questions of law or fact common to the members of the class [that] predominate over any questions affecting only individual members" and certification must be "superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  To make these findings, the Court considers "the interest of members of the class in individually controlling the prosecution or defense of separate actions; . . . the desirability or undesirability of concentrating the litigation of the claims in the particular forum; . . . [and] the difficulties likely to be encountered in the management of a class action."  Id.

Certification under (b)(3) is not appropriate.  Several of the class representatives have defenses unique to them, which, if successful, could entirely bar their claims.  The presence

---

[42] Although Plaintiffs suggest bifurcating the proceedings, they do not argue that the Court should consider a "hybrid" certification, certifying the issue of liability for class treatment and leaving the damages for individual adjudication.  See Morgan, 169 F.R.D. at 358.  However, even if Plaintiffs were arguing for "hybrid" certification, it would not be appropriate in this case because Plaintiffs have failed to meet the requirements of Rule 23(a) and, alternatively, failed to satisfy either Rules 23(b)(2) or (b)(3).  See Monreal, 367 F.3d at 1237 n.12; Boughton, 65 F.3d at 826.

of these defenses causes the Court to question whether the class claims are truly predominate. Further, the need to adjudicate the individual claims for back pay and front pay causes manageability concerns, even in bifurcated proceedings.  See Zapata, 167 F.R.D. at 166 (relying on Windham v. Am. Brands, Inc., 565 F.2d 59, 68 (4th Cir. 1977), to deny certification where computation of damages would result in individual "mini-trials" and, accordingly, dominate over the common issue of liability).  Finally, because no company-wide practice of discrimination has been identified and for the reasons for which the Court did not find commonality, the Court concludes that class claims are not predominate. Because the requirements of Rule 23(b)(3) are not satisfied, certification is inappropriate.

*D.  Adequacy of Class Counsel – Rule 23(g)*

As a final note, the Court recognizes Defendant's arguments pertaining to Mr. Jack Rosenberg's potential conflict of interest.  Rosenberg, one of Plaintiffs' counsel, is also a member of the putative class.  Notably, Rosenberg brought his own claim asserting failure to promote and constructive discharge similar to those asserted by the class.  (See Rosenberg Compl., Def.'s Exh. 50.)  In addition, Rosenberg is a potential witness for Wade's individual claims.

The Court has an obligation to consider a number of factors before appointing class counsel, including "any . . . matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(C)(ii).  Obviously, the potential for a conflict of interest is a pertinent matter.  See In re Integra Realty Res., Inc., 262 F.3d

1089, 1112 (10th Cir. 2001). The necessity of the Court's role in approving class counsel

is best summarized in Judge Smith's dissent in the asbestos cases, where he stated:

> In ordinary litigation, a plaintiff does not need the court to ensure that his attorneys are performing adequately; he can monitor and control them himself. In class litigation, however, class members have no practical control over their attorney.[FN37] . . . Rule 23[g] prohibits a court from certifying a class without first ascertaining that it will receive adequate representation. Rule 23's concerns are not merely prudential, but constitutional: Due process demands that class members receive adequate representation before they are bound by a judgment.[] An attorney who labors under a conflict of interest cannot satisfy the requirements of Rule 23[g].

> [FN37] In theory, the class representative should control the attorney. In practice, class counsel often selects the class representative and is likely to pick one who is passive. *Cf. In re Dresser Indus.*, 972 F.2d 540, 545 n.11 (5th Cir. 1992) (noting consent of client in a class action is of "limited utility" as a safeguard against conflicts of interest).

In re Asbestos Litigation, 90 F.3d 963, 1009 (5th Cir. 1996) (J. Smith, dissenting).

"Courts have disagreed on the propriety of an attorney who is a plaintiff in a class

action who also seeks to serve as attorney for the class. . . . Most courts have held that such

a dual role is 'inherently fraught with potential conflicts of interest.'" 1 Newberg on Class

Actions § 3.40 (4th ed. 2002) (citation omitted); see also Fechter v. HMW Indus., 117 F.R.D.

362, 365 (E.D. Pa. 1987) (disqualifying counsel under "appearance of impropriety" language

from Canon 9 of the Code of Professional Responsibility); Petrovic v. Amoco Oil Co., 200

F.3d 1140, 1154-55 (8th Cir. 1999) (agreeing with Fifth Circuit that clear danger exists for

a conflict of interest where there is a close familial bond between counsel and class

representative). Further, "'it is elementary that counsel may not participate both as an

advocate and as a witness, absent special circumstances.'" Lott, 200 F.R.D. at 548-49

(quoting Spivey v. United States, 912 F.2d 80, 84 (4th Cir. 1990)).

Clearly, there is, at a minimum, a significant potential for a conflict of interest in this

case.  However, because certification is not otherwise warranted, the Court need not decide

whether that potential would disqualify Rosenberg from serving as class counsel and, if he

could not serve, what impact that would have on the question of certification.

## CONCLUSION

Class actions serve three principal functions:  (1) facilitating judicial economy by

avoiding multiple suits on the same subject matter; "(2) providing a feasible means for

asserting the rights of those who 'would have no realistic day in court if a class action were

not available;' and (3) deterring inconsistent results and assuring a uniform, singular

determination of rights and liabilities." Webb, 206 F.R.D. at 403 (quoting Phillips Petroleum

Co. v. Shutts, 472 U.S. 797, 809 (1985)).  These interests are not served by certification in

this case.  Therefore, consistent with the reasoning provided above, the Court DENIES

Plaintiffs' motion for class certification (Dkt. No. 76).

IT IS SO ORDERED this 10th day of August 2005.


ROBIN J. CAUTHRON
United States District Judge

44