IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| MARVIN ARMSTRONG, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. CIV-03-0255-C |
| | ) | |
| SHEILA C. BLAIR, Chairman of the | ) | |
| Federal Deposit Insurance Corp., Inc.,[1] | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION & ORDER

Defendant Federal Deposit Insurance Corporation (FDIC)[2] has moved for summary

judgment on all claims asserted by Plaintiffs Doris Marsh, Rodney Wade, Marvin

Armstrong, and Ellis Hopper.  These Plaintiffs have responded and the FDIC has filed reply

briefs.

## BACKGROUND[3]

---

[1]  Shelia C. Blair became the Chairman of the FDIC in June 2006.  Pursuant to Federal Rule of Civil Procedure 25(d), she is substituted as a party to this action in place of the former Chairman.

[2]  The Court has held that the Chairman of the FDIC, in his or her official capacity, is the proper defendant in this action.  (Dkt. No. 18.)  However, for convenience, the Court refers to the Defendant as the FDIC.

[3]  Local Rule 56.1(b) requires parties opposing summary judgment to state the number of the movant's facts that is disputed, if applicable.  "All material facts set forth in the statement of the material facts of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of material facts of the opposing party."  LCvR 56.1 (c).  Plaintiffs have attached lists of disputed material facts and lists of undisputed material facts to their response briefs.  However, they do not specifically refer to the numbered paragraphs in the FDIC's "Statement of Undisputed Material Facts."  Without such specific reference, the Court's effort to determine what factual disputes exist has been hampered.  Nevertheless, the Court has endeavored to treat as undisputed only those facts included in the FDIC's brief to which no mention is made by Plaintiffs and those facts presented by Plaintiffs that do not conflict with the FDIC's recitation.

Eight individual Plaintiffs, including Marsh, Wade, Armstrong, and Hopper, filed this action complaining that the FDIC discriminated against them on the basis of age. Specifically, they contend:

> [S]ince the fall of 1995 to the present, the FDIC has continually violated the ADEA [(Age Discrimination in Employment Act)], 29 U.S.C. § 633a, through its discriminatory application of the selection practice governing its selecting officials' choices of candidates for senior-level promotions from "rosters of eligibles"–predetermined lists of the nine best qualified *alphabetically-listed* applicants for those jobs. Repeatedly and across all senior grade levels, the selecting officials constantly picked substantially younger, no more qualified employees instead of employees ages 40 and up.

(Pls.' Resps. at 1.) Summary judgment has been granted in favor of the FDIC with respect to claims by two of the original eight plaintiffs, Billy Carroll and Harvey Melton. (Dkt. No. 176.) The FDIC has not sought summary judgment on the claims asserted by two other plaintiffs–Angela Filippini, as administrix of Vincent Filippini's estate, and Curtis Vaughn. For convenience, when referring to Marsh, Wade, Armstrong, and Hopper collectively, the Court will identify them simply as Plaintiffs.

The specifics of the FDIC's application and selection process and Plaintiffs' allegations are detailed in the Court's order denying class certification (Dkt. No. 124) . The Court will not repeat that extensive discussion here, except as to those facts that are especially relevant to this motion.

A.    *Marsh*

Marsh was born September 17, 1942. She was hired by the FDIC in 1978 as a Senior Financial Analyst. She received two promotions during her tenure with the FDIC.

Marsh applied for three positions in 1996, but was not selected for any of them.  At the time of her retirement on September 28, 2002, Marsh was an Examiner Specialist in the Accounting Section of the Policy Branch of the Division of Supervision (DOS), which was a grade 15 position that she had held since 1989.  She submitted her buyout application and notice of intent to retire on April 10, 2002.

Also in April 2002, Marsh applied for the position of Associate Director, Risk Management Policy/Examination Support, an E-1/E-2 level position.  The Vacancy Announcement contained the following information regarding duties and required qualifications:

SUMMARY OF DUTIES:

The incumbent represents the Division in coordinating activities of bank examination, bank supervisory, and bank risk assessment practices, procedures and methods within and outside the Corporation.  Directs the activities of the Accounting and Securities areas that provide expertise on accounting, auditing, capital, reporting, securities and tax issues.  In addition, supervises the specialized activities involving securities analysis, registration reporting and disclosure by banks under the Securities Exchange Act.

QUALIFICATIONS REQUIRED:

For E-[1], candidate must have one year of specialized experience equivalent to the CG-15.  For E-[2], candidate must have one year of specialized experience equivalent to E-[1].  SPECIALIZED EXPERIENCE is experience managing a professional staff responsible for programs associated with the management of programs associated with financial institution supervision and examination functions including accounting, auditing, securities and tax issues.  Such experience must demonstrate responsibility for developing methods to strengthen and improve the operations of financial institutions and to minimize individual and systemic risks to the Corporation.

(Def.'s Marsh Mot. Ex. 9.)   Four "QUALITY RANKING FACTORS (DESIRABLE KNOWLEDGE, SKILLS AND ABILITIES)" were also included in the announcement. These related generally to leadership ability and knowledge of bank examination, "bank supervisory," and bank risk assessment programs, practices and procedures.[4]

Marsh was placed on a "roster of eligibles," indicating that she was qualified for the position.  However, she was not selected.  Rae Ann Miller (who was born on October 21, 1967, making her Marsh's junior by 25 years) was initially selected for the position, but declined the offer.  Steve Fritts was then selected for the position.  Fritts was born August 10, 1951, making him 50 at the time of selection and Marsh's junior by 9 years.

The roster of eligibles ("Merit Promotion Roster") for the position identified four individuals, including Marsh, under the heading "EO-01 ELIGIBLES" and three individuals, including Miller, under the heading "E0-02 ELIGIBLES." (Def.'s Marsh Mot.

---

[4] The four quality ranking factors were:

1.     Ability to develop, enhance and lead programs, including the planning and utilization of budget, personnel, and financial resources, that contribute to and improve organizational performance.

2.     Ability to provide leadership and manage human resources by creating opportunities that are equitable and consistent with Corporate diversity goals.

3.     Ability to represent the Corporation in a variety of internal and external forums on matters such as complex analytical, organizational and policy related issues.

4.     Knowledge of bank examination, bank supervisory, and bank risk assessment programs, practices and procedures.

(Def.'s Marsh Mot. Ex. 9.)

Ex. 10.)   Fritts was included on the "Non-Competitive Eligibles Memorandum for Executive Level" for the Associate Director position, along with three other individuals. (Id.)

Michael Zamorski was the selecting official for the Associate Director position.  The "Candidate Selection Justification" completed by Zamorski on June 14, 2002, contained the following explanation for why Fritts was selected:

> Mr. Fritts' career clearly evidences the ability to develop, enchance [sic] and lead programs as evidenced by various experiences over a 25+ year career. Specifically, he lead [sic] significant change initiatives in RTC, where he lead [sic] efforts that resulted in a fundamental change in asset disposition/marketing.  He has handled several organizational start-ups and down-sizing efforts.  He has a solid knowledge of bank examination and supervision as a field bank examiner, review examiner and ARD, managing examination programs at both the region and headquarters (DCA) levels.  His broad knowledge of financial services industry issues, coupled with his substantial managerial leadership experience makes[] him well suited for this role.

(Def.'s Marsh Mot. Ex. 11.)

*B.     Wade*

Wade joined the FDIC in 1990 as a grade 13 Senior Attorney working for the Resolution Trust Corporation in Tampa, Florida.  In 1993, he received a grade increase to 14, and he subsequently applied for and was selected for positions that required his transfer to different offices.  Wade has been licensed to practice law since 1973.  Before joining the FDIC, he worked for the Internal Revenue Service, in private practice, and for the Department of the Army.

Wade was separated, effective August 29, 1997, from the FDIC as part of a reduction in force in the Atlanta office. However, prior to his separation, Wade sought another attorney position in Dallas, Texas.[5]

In January 1997, it was announced that several "goodwill" attorney positions in the Dallas office would become available, with some filled on the basis of seniority and others filled on the basis of merit. (Dkt. No. 148, Def.'s Wade Mot. Ex. 18, Thomas Aff. ¶¶ 2-3.) An "Opportunity for Voluntary Reassignment," issued on July 18, 1997, identified vacancies in the Goodwill Unit in Dallas: one non-permanent Council position (grade 15) and two non-permanent Senior Attorney positions (grade 14).[6] The positions would be filled by lateral reassignment of permanent grade 14 and 15 attorneys. No promotions would be permitted through the selection process. The announcement contained the following description of duties and qualifications:

SUMMARY OF DUTIES:

Incumbent serves as a Senior Attorney or Counsel reporting to a Section Chief or Team Leader in the Goodwill Unit. Handles a variety of duties related to the Goodwill litigation on behalf of the Corporation in its pursuit of claims originally belonging to failed financial institutions. A number of these cases have been filed in the Court of Federal Claims as a result of the passage of FIRREA and its elimination of supervisory goodwill. Additional possible claims remain to be investigated. Incumbent will be

---

[5] Although the FDIC addresses Wade's application for positions in Memphis and Atlanta in its opening brief, Wade's response makes clear that this litigation is based solely on his non-selection for a Dallas position. (Dkt. No. 163, Wade's Resp. at 1.)

[6] Apparently, the two non-permanent Senior Attorney positions actually related to four vacancies.

expected to perform the following:  personally review documents and prepare[] them for production in discovery; review and select documents produced in discovery by others; review FDIC files and select documents for use in pre-trial proceedings and at trial; prepare witnesses for deposition and trial testimony, depose witnesses, interview potential witnesses, draft motions and supporting memoranda and affidavits and respond to motions and prepare pre-trial and post-trial briefs and try cases.  Incumbent will also be expected to analyze the merits and value of pending and possible claims, make recommendations on whether to proceed and attempt to settle them. Working with co-counsel may be required.

DESIRABLE QUALIFICATIONS:

1.      Knowledge of Federal and State financial institution receivership, commercial and procedural laws and regulations.
2.      Knowledge of the records and finances of failed financial institutions.
3.      Skill in discovery proceedings, trial and pre-trial preparation, trial strategy and argument and procedure at the trial and appellate levels.

(Def.'s Wade Mot. Ex. 17.)

Wade applied (through the Merit Promotion Plan (MPP)) for a grade 15 term appointment, which would have resulted in a promotion.  (Def.'s Wade Mot. Ex. 24.)  He was considered for the grade 14 term appointments.  (Def.'s Wade Mot. at 6-7 ¶ 15.)  Wade was placed on the "roster of eligibles," indicating he was considered qualified for the position.  (See Def.'s Wade Mot. Ex. 21.)  At that time, Wade was 51 years old.

The official responsible for making selections for these Goodwill attorney positions was John Thomas.  At the time, Thomas was 51 years old.  Thomas made his selections from rosters (or "Referral Lists") provided by the FDIC's Personnel Services Branch. According to Thomas, he made his selections based on applicant past and/or expected work

performance and using the selection criteria set out in the job announcement. (Thomas Aff. ¶ 12.) He explained:

> The most important criterion in making selections was my evaluation, based on the information I had available, of how well each applicant could be expected to independently handle hands-on litigation of complex cases. The Position Description for this position (ROI, Ex. 26) stated that the work was of the highest level of difficulty and complexity and was to be completed with a minimum of direction and review. The position announcement . . . also reiterated these requirements.

> The quality of work I could expect from a candidate was more important to me than total years of experience or total years as an attorney. This was especially the case when applicants each had several years of experience. All of the applicants were experienced attorneys.

(Thomas Aff. ¶¶ 13 & 14.)

For the non-permanent Senior Attorney positions (with a term not to exceed December 31, 1999), Thomas selected three individuals from a nine-person list, which included Wade. (Def.'s Wade Mot. Exs. 18 & 21.) The applicants selected were: Mark J. Kingsolver (43 years old); Karen O'Connor (40 years old when she applied but 41 years old on date of selection); and Sam Plaisance (40 years old). Another individual, Frank Vaughan (51 years old) was initially selected but declined the offer. The ages of the other non-selected candidates are not provided.

For the non-permanent Senior Attorney position (with a term not to exceed December 31, 1998), Thomas selected one individual from a six-person list, which included

Wade.  Robert Golden (41 years old) was selected.  Again, the ages of the other non-selected candidates are not provided.

In explaining why Wade was not selected, Thomas stated that in his review of Wade's application materials:

> [A]lthough there are numerous references to litigation, I saw little evidence that [Wade] litigated complex cases.
>
> My review of [Wade's] performance appraisal comments revealed several lackluster comments referring to the fact that [Wade] "meets most deadlines," "did not want this assignment" and performed well in "tasks he did not wish to assume."  The work on the assignment in question (the Golddome Credit Corp. assets) is mentioned in many sections of the performance appraisal, and the repeated reference to the reluctance of [Wade] to take on this work caused me to be concerned about [Wade's] willingness to jump into existing litigation enthusiastically.  In addition, the Golddome work does not evidence hands on litigation since outside counsel was used.

(Thomas Aff. ¶¶ 15-16.)

### C.   *Armstrong & Hopper*

Armstrong was hired by the FDIC in 1965 in the Dallas office.  He received several promotions and, in 1996, he was selected for a grade 14 Bank Examiner and Field Office Supervisor (FOS) position in Oklahoma City.  Armstrong was 54 years old at the time

Hopper joined the FDIC in 1974 as an Assistant Examiner in the Nashville office.  He received several promotions and, in 1989, he was selected for a grade 14 FOS position in Charlotte, North Carolina.

As part of a reorganization, the FDIC replaced a total of 159 FOS offices with 82 territories in 2002.  A new Field Supervisor (FS) position was created to supervise each territory and to replace the former FOS position.

> FSs oversee DSC's[7] work in the field, including the oversight of bank examinations and bank examiners.  These jobs carried greater responsibility than the previous field manager positions, the . . . FOS.  Unlike the previous FOS positions in the now-defunct DOS and DCA, FSs had increased spans of control over personnel (both geographically and organizationally), increased delegations of authority to make decisions and approve examination reports without approval from regional offices, increased contact with senior bank personnel, and a new outreach and public relations function.

(Dkt. No. 147, Def.'s Armstrong & Hopper Mot. Ex. 10, Thompson Decl. ¶ 12.)

"An enhanced merit selection process" was designed to handle this transition and the more than 500 applications submitted by 330 employees for the 82 available FS positions.  Applicants could apply for multiple FS positions, but they were considered for only those positions for which they actually applied.  A total of 293 qualified applicants were deemed "Best Qualified" and allowed interviews.  Thirty-four people were involved in the selection process.  The selecting officials were the FDIC's six Regional Directors. They reviewed notes from the interview panels, the applications and the applicant's preferences, and (purportedly) based on the Vacancy Announcement criteria, individually

---

[7] The DSC, Division of Supervision and Consumer Protection, was created in February 2002 and was a "merger" of the DOS, Department of Supervision, and the DCA, Division of Compliance and Consumer Affairs.  (Dkt. No. 147, Def.'s Armstrong & Hopper Mot. Ex. 10, Thompson Decl. ¶ 5.)

selected applicants for specific FS positions.[8]  Approving Officials reviewed the selections, which were announced on August 16, 2002.

In 2002, Armstrong applied for one grade 14 FS position in Oklahoma City.  He was interviewed by a panel.  However, Regional Director John Carter selected Wayne Nichols for the position.  Carter explained that he selected Nichols (over Armstrong) because of his excellent performance in a variety of prior positions, his (much higher) interview scores, and the completeness of his application package.  (Def.'s Armstrong & Hopper Mot. Ex. 12, Carter Decl. ¶ 7.)  Nichols was in his early 50s.  Armstrong admitted that he did not have any specific reason to believe that the younger individuals who interviewed him scored him lower because of his age.  (Def.'s Armstrong & Hopper Mot. Ex. 4 at 92-93.)  In September 2002, after his non-selection, Armstrong accepted a buyout and retired.

---

[8] The Quality Ranking Factors (Desirable Knowledge, Skills, Abilities) were identified as:

- Ability to provide leadership and manage organizational change consistent with Division and Corporate initiatives.
- Ability to review Reports of Examination, including those recommended for formal and informal enforcement actions.
- Ability to perform the full range of supervisory duties, including individual development, coaching, mentoring and fostering diversity.
- Ability to oversee the examination of financial institutions including those with complex specialty areas and/or exhibiting problem characteristics.
- Ability to represent the Corporation in a variety of internal and external forums on complex examination and regulatory issues.

(Def.'s Armstrong & Hopper Mot. Ex. 11.)  Applicants were to be evaluated "on the basis of information provided in their application package."  (Id.)

In 2002, Hopper applied for eight FS positions.[9]  For seven of those positions, an applicant was selected who was at least 3 years and nine months younger than the 53-year-old Hopper.[10]  Mark Schmidt was the selecting official for four FS positions for which Hopper was not selected.  Schmidt selected John Poskonka, Deona Payne, Patricia Wynegar, and Maria Melero.  Schmidt explained his selection of these applicants over Hopper as based on:

1.  Poskonka's experience, employee development and interpersonal skills, strong recommendation, and impressive application and interview (Def.'s Armstrong & Hopper Mot. Ex. 14, Schmidt Decl. ¶ 7);

2.  Payne's FOS experience, her reputation and strong recommendation, her activity in "change management initatives," innovations and employee development, interview performance and (more detailed) application (id. at ¶ 6);

3.  Wynegar's superior background, experience, and management skills, recommendation, strengths as a spokesperson, interview performance, and stronger application (id. ¶ 5); and

4.  Melero's strong examination skills, role in a number of organizational change initiatives, strong interview and application.  (Id. ¶ 8.)

---

[9]  Hopper also applied and was not selected for six grade 15 FS positions.  However, he does not base his disparate treatment claims on those non-promotions.

[10]  Notwithstanding the FDIC's assumption for purposes of summary judgment that Hopper could make out a prima facie case of disparate treatment, the Court does not consider the non-selection for the position awarded to Jacqueline Milot because Hopper concedes that as a matter of law she was not substantially younger.  (Armstrong & Hopper's Resp. at 7-8.)

John Carter selected John Perez over Hopper for another position.  Carter explained his selection based on Perez's experience, skills, performance appraisals, strong interview, working relationships and superior application and credentials. (Carter Dec. ¶ 7.)

Scott Polakoff was the selecting official for two other FS positions for which Hopper was not selected.  Polakoff selected Richard Perkins and Lisa Ennis and admits that he was concerned about the strength of Hopper's interpersonal skills.  (Def.'s Armstrong & Hopper Mot. Ex. 13, Polakoff Decl.)  He explained his selection of these applicants over Hopper as based on:

1.  Perkins' status as an incumbent in one of the two field offices being combined, superior interpersonal skills, management and supervisory skills, demonstrated leadership, examination and report processing skill (<u>id.</u> ¶ 6); and

2.  Ennis's leadership, management and report processing skills, experience, and interpersonal skills (<u>id.</u> ¶5.)

After his non-selection and in September 2002, Hopper accepted a buyout and retired.

### E.    Statistical Analysis

Plaintiffs' expert, Dr. Donald T. Gantz, analyzed available data to determine whether disparities in job selections rates based on age existed for higher grade vacancies within the FDIC from 1996 to 2003.  (Dkt. No. 81, Pls.' App'x Ex. 62, Gantz Report.)  Dr. Gantz considered the ages of those selected for these positions compared to the ages of non-selected applicants who had been "referred" to the selecting official on a "roster of

13

eligibles," indicating that those applicants were highly qualified (as determined by an HR specialist or panel of subject matter experts).  (See Dkt. No. 77, Pls.' Br. in Support of Class Certification at 31 & Dkt. No. 124 at 10-11.)[11]  Based on his analysis, Dr. Gantz determined that:

> [F]or grades 11, 12, 13, 14 and 15 there are persistent patterns of higher selection rates for applicants under the age of 40 when compared to the selection rates of similarly situated applicants who are 40 years and older. Many separate selection rate comparisons within a particular year and grade show a statistically significant disparity that favors applicants under the age of 40.  Additionally, many comparisons within logically contiguous spans of years and grades show a highly statistically significant disparity that favors applicants under the age of 40.

(Gantz Report at 1.)  Dr. Gantz found that during 1996-2003, for employees in positions grades 11-15 who were applying to vacancies at those grades, regardless of whether the position sought was at a grade level higher, the same, or higher and lower (i.e., "mixed"), there was "an overall selection rate advantage for referred applicants who are under 40 years old."  (Id. at 9.)

### F.    Ageist Comments

Finally, Plaintiffs identify ageist comments by the FDIC's Board of Directors, Chairman, Regional Managers, an Assistant Director of Policy, a Director of the Office of Equal Opportunity, and various division officials as well as an FDIC memorandum.  (See

---

[11] "For a comparison to be possible, there must be at least two referred applicants in each of the two age groups and selected applicants in at least one group."  (Gantz Report at 8.)

Pls.' Undisputed Material Facts.)  This evidence is the same as that detailed in the order

denying class certification.  (Dkt. No. 124.)

STANDARD

Summary judgment is proper only if the moving party shows "there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law."  Fed. R. Civ. P. 56(c).  "An issue of fact is 'material' if under the substantive law

it is essential to the proper disposition of the claim."  See Adler v. Wal-Mart Stores, Inc.,

144 F.3d 664, 670 (10th Cir. 1998).  "An issue is 'genuine' if there is sufficient evidence

on each side so that a rational trier of fact could resolve the issue either way."  Id.  When

deciding whether summary judgment is appropriate, the Court views the evidence in the

light most favorable to the nonmoving party and draws all reasonable inferences in that

party's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Simms v.

Okla. ex rel. Dep't of Mental Health, 165 F.3d 1321, 1326 (10th Cir. 1999).  At the

summary judgment stage, the Court's function is not to weigh the evidence but to

determine whether there is a genuine issue for trial.  Willis v. Midland Risk Ins. Co., 42

F.3d 607, 611 (10th Cir. 1994).  When the nonmovant will bear the burden of proof at trial,

summary judgment is avoided only by going beyond the pleadings and presenting evidence

sufficient to establish the existence, as a triable issue, of an essential and contested element

of the case.  Perry v. Woodward, 199 F.3d 1126, 1131 (10th Cir. 1999).

15

DISCUSSION

Plaintiffs assert age discrimination claims under disparate impact and disparate treatment theories based on "the FDIC's practice of using the specific factors, including interviews, prescribed by its Merit Promotion Plan ("MPP") to select from among the qualified applicants on the roster of eligibles."  (Pls.' Resps. at 1.)  In addition, Plaintiffs claim that the FDIC's practice of using the MPP factors created a hostile work environment.  (Id.)

A.    *Claims Plaintiffs Are Not Pursuing*

The Court begins with a number of claims that Plaintiffs make clear in their Responses that they are *not* pursuing.  Marsh clarifies that she is not pursuing a constructive discharge claim or a discrimination claim based on her non-selection for positions in the 1990s.  (Dkt. No. 158, Marsh Resp. at 1.)  Wade clarifies that he is not pursuing claims based on his non-selection for positions in Memphis and Atlanta.  (Dkt. No. 163, Wade Resp. at 1.)  Armstrong and Hopper do not respond to the FDIC's arguments related to constructive discharge but rather focus on their non-selection for FS positions.  Therefore, the FDIC is entitled to summary judgment on those claims.

B.    *Disparate Impact*

Plaintiffs complain that the FDIC's practice of using the specific factors, including interviews, prescribed by its MPP to select from among the qualified applicants had a significant disparate impact on them.  In addition, they note that regardless of whether or

not those factors are objective, the interviews are subjective.  And, even if interviews were not involved, the facially neutral practice of using totally objective factors in a final selection process is subject to disparate impact analysis.

Employers may be sued under the ADEA for employment practices that have a disparate impact on older workers.  Smith v. Jackson, Miss., 544 U.S. 228 (2005).  Thus, a plaintiff may challenge a facially neutral practice without having to show evidence of an employer's discriminatory intent (as required in a disparate treatment case).  Wards Cove Packing Co.  v. Atonio, 490 U.S. 642, 645-46 (1989).  To make out a prima facie case of age discrimination under a disparate impact theory, a plaintiff may rely on statistical evidence showing that a specific or particular employment practice has had a significant disparate impact on older workers.  Wards Cove, 490 U.S. at 650; Pippin v. Burlington Res. Oil & Gas Co., 440 F.3d 1186, 1200 (10th Cir. 2006).  Once the ADEA disparate impact plaintiff establishes a prima facie case, the burden (of production) shifts to the employer to offer a business justification for that practice.  Id.  That business justification need only be based on "reasonable factors other than age" (RFOA).  Pippin, 440 F.3d at 1200; 29 U.S.C. § 623(f)(1).  Thus, "to prevail on an ADEA disparate impact claim, an employee must ultimately persuade the factfinder that the employer's asserted basis for the neutral policy is *unreasonable*.  The test is not whether there were other more narrowly tailored ways for the employer to achieve its legitimate business goals."  Id. (citation omitted).

17

For purposes of summary judgment, the Court will assume that Plaintiffs could make out a prima facie case that the FDIC's practice of allowing selecting officials to make final job-selection decisions had a significant disparate impact on them and other ADEA-protected senior-level employees.   However, as the Court has previously noted, a selecting official's discretion to choose from among qualified candidates is not unfettered.  (Dkt. No. 124 at 33.)   There was no evidence at the certification stage and Plaintiffs have not now identified specific facts suggesting that the discretion given to selecting officials to rank candidates was unreasonable.   Thus, the FDIC is entitled to summary judgment based on a RFOA defense.      In other cases, courts have appreciated that in the context of senior-level positions, an employer may exercise discretion or use some subjective factors to make its selection from among objectively qualified candidates so long as the decision is not based on an unlawful criteria such as age.   See Simms, 165 F.3d at 1330; Pitre v. W. Elec. Co., 843 F.2d 1262, 1272 (10th Cir. 1988).   Although Plaintiffs might prefer that a different job selection method had been adopted, they fail to identify evidence that any part of the MPP is objectively unreasonable.   Cf. Hawkins v. Bounds, 752 F.2d 500, 503-504 (10th Cir. 1985) (finding, in Title VII case, no evidence that "totally discretionary" practice of temporarily "detailing" employees to a higher level position and selecting employee from board recommended list were required by business necessity).   Thus, the FDIC is entitled to summary judgment on Plaintiffs' disparate impact claims.

C.    *Disparate Treatment*

In the absence of direct evidence of age discrimination, the <u>McDonnell Douglas</u>[12]

burden-shifting scheme applies to an ADEA disparate treatment claim.  <u>Pippin</u>, 440 F.3d

at 1192.  If the plaintiff makes out a prima facie case of age discrimination[13] (or to survive

summary judgment, raises a genuine issue of material fact on each element of the prima

facie case), "[t]he burden of production then shifts to the employer to articulate a legitimate

nondiscriminatory reason for taking the adverse action against the plaintiff."  <u>Hardy v. S.F.</u>

<u>Phosphates Ltd. Co.</u>, 185 F.3d 1076, 1080 & n.2 (10th Cir. 1999).  "The burden then shifts

back to the plaintiff to present evidence 'such that a reasonable jury could conclude that the

proffered nondiscriminatory reason for the employment action is pretextual, that is,

"unworthy of belief."'"  <u>Id.</u> at 1080 (citations omitted).

The FDIC concedes for purpose of summary judgment that Plaintiffs could make out

prima facie cases of age discrimination based on their non-selection for various positions.

However, it argues that the decisions were based on legitimate non-discriminatory reasons

and that there is no evidence of pretext.  Specifically, the FDIC offers the following

justification for the non-selections at issue:

---

[12] <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973).

[13] To make out a prima facie case of age discrimination in a non-selection case, a plaintiff
must show:  (1) she was at least 40 years old; (2) she applied for and was qualified for the position;
(3) the position was filled by a younger person.  <u>See</u> <u>MacKenzie v. City & County of Denver</u>, 414
F.3d 1266, 1277 (10th Cir. 2005).

a.      with respect to Marsh's non-selection for the Associate Director position in 2002, the FDIC contends that Zamorski based his selection on the conclusion that Fritts had executive-level management experience and a track record of leading programs and staff and "solid knowledge of bank examination and supervision" from several of his prior positions (Def.'s Marsh Mot. at 10-11 (quoting Def.'s Marsh Ex. 11));

b.      with respect to Wade's non-selection for a Senior Attorney position in the Goodwill Unit, the FDIC contends that Thomas made his selections based on his determination of how well the candidates would "independently handle hands-on litigation of complex cases," (Thomas Aff. ¶ 13), including the quality of their work and the candidates' applications and their enthusiasm for the required tasks.  According to Thomas, Wade's experience with complex litigation was limited (in the sense of having frequently directed outside counsel as opposed to litigating the cases himself), and Wade's evaluations suggested, at least to Thomas, that Wade would not "jump into existing litigation enthusiastically" (Thomas Aff. ¶¶ 15-16);

c.      with respect to Armstrong's non-selection, the FDIC contends that Carter made his selection based on the Quality Ranking Factors and his determination that the selected applicant had an excellent performance record and superior interviews and application package (see Def.'s Armstrong & Hopper Mot. at 16-18);

d.      with respect to Hopper's non-selections, the FDIC contends that the selecting officials made their selections based on the given criteria as well as the substantive experience of the candidates, their performance records, their interpersonal skills, their supervisory and management skills, and their ability to handle change initiatives (see id. 18-20).

The Court finds these reasons nondiscriminatory and legitimately related to the duties of the respective positions.  Cf. Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1169 (10th Cir. 1998) ("There may be circumstances in which a claimed business judgment is so idiosyncratic or questionable that a factfinder could reasonably find that it is a pretext for illegal discrimination."); Furr v. Seagate Tech., Inc., 82 F.3d 980, 987 (10th Cir. 1996)

(explaining, in dicta, that "potential" is a legitimate, if "somewhat subjective," factor to consider in a reduction in force).  Thus, to survive summary judgment, Plaintiffs must present evidence creating a genuine issue of material fact as to whether those reasons were pretextual or "unworthy of belief."

"'Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" Hardy, 185 F.3d at 1080 (citation omitted).  "'The relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [it] honestly believed those reasons and acted in good faith upon those beliefs.'" Rivera v. City & County of Denver, 365 F.3d 912, 924-25 (10th Cir. 2004) (citation omitted).  "Evidence of pretext may include 'prior treatment of plaintiff; the employer's policy and practice regarding . . . employment [of those 40 and above] (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating . . . criteria); and the use of subjective criteria.'" Jaramillo v. Colo. Judicial Dep't, 427 F.3d 1303, 1308-09 (10th Cir. 2005) (citation omitted).  An overwhelming or obvious disparity in the successful candidate's qualifications when compared to the plaintiff's may also support an inference of pretext.  Id. at 1309.

Plaintiffs rely on statistical evidence, hostility within the FDIC towards older, senior level-employees, the use of subjective criteria, and their own objective qualifications to

show pretext.  In addition, some contend that the proffered reasons for their non-selections are unsupportable with reference to the application materials, that prior non-selections show a pattern of age discrimination, or that selecting officials considered materials not sanctioned by the MPP (such as interview notes).  Having carefully considered the evidence presented by Plaintiffs, the Court finds that in each instance, there is a genuine issue of material fact in dispute as to pretext.  Thus, the FDIC's motions are denied with respect to Plaintiffs' disparate treatment claims.

> D.     *Hostile Work Environment*

Finally, Plaintiffs note in each Response that they have pleaded a "hostile-work environment theory," which the FDIC has not challenged on summary judgment. (See Pls.' Resp. at 1 & 2 n.1.)  In each of its Replies, the FDIC complains that Plaintiffs have never before suggested they had a hostile work environment claim.  Plaintiffs have not sought leave to respond to the FDIC's argument.  Thus, the Court will consider it.  See Pippin, 440 F.3d at 1192 (explaining that a court may not forbid at summary judgment a nonmovant from responding to new arguments raised in a reply brief if the court relies on those arguments.)   A claim for hostile work environment because of age is actionable.  However, like other hostile work environment claims, to survive summary judgment, the claimant must show some factual basis that could support a finding that the workplace was "'permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe and pervasive to alter the conditions of the victim's employment and create an abusive

working environment.'" <u>MacKenzie v. City & County of Denver</u>, 414 F.3d 1266, 1280

(10th Cir. 2005) (<u>quoting</u> <u>Penry v. Fed. Home Loan of Topeka</u>, 155 F.3d 1257, 1261 (10th

Cir. 1998)).

> To evaluate whether a working environment is sufficiently hostile or abusive,
> [the Court at summary judgment must] examine all the circumstances,
> including: (1) the frequency of the discriminatory conduct; (2) the severity
> of the conduct; (3) whether the conduct is physically threatening or
> humiliating, or a mere offensive utterance; and (4) whether the conduct
> unreasonably interferes with the employee's work performance. In addition,
> the environment must be both subjectively and objectively hostile or abusive.

<u>Id.</u> (citation omitted).

The Court finds that Plaintiffs fail to raise a genuine issue of material fact with

respect to their asserted hostile work environment claim. Notwithstanding the reference

to <u>Maldonado v. City of Altus</u>, 433 F.3d 1294, 1304 (10th Cir. 2006), Plaintiffs have not

elaborated on a possible disparate impact claim based on hostile work environment beyond

the assertion that the final selection process in the MPP created a hostile work environment.

Because Plaintiffs have not set forth specific facts showing that there is a genuine issue for

trial that they experienced a severe or pervasive discriminatory work environment that

unreasonably interfered with their work performance, the FDIC is entitled to summary

judgment on the hostile work environment claims.

CONCLUSION

Accordingly, Defendant's motion for summary judgment on claims by Plaintiff

Marsh (Dkt. No. 149), Defendant's motion for summary judgment on claims by Plaintiff

Wade (Dkt. No. 148), and Defendant's motion for summary judgment on claims by Plaintiffs Armstrong and Hopper (Dkt. No. 147) are GRANTED in part and DENIED in part.  The FDIC is entitled to summary judgment on all claims except Plaintiffs' disparate treatment claims.  Judgment shall issue at the conclusion of these proceedings.

IT IS SO ORDERED this 11th day of September, 2006.


ROBIN J. CAUTHRON
United States District Judge